[733 NYS2d 136]

RHONDA WEINGARTEN, as President of United Federation of Teachers, Local 2, American Federation of Teachers, AFL-CIO, et al., Respondents, v BOARD OF TRUSTEES OF THE NEW YORK CITY TEACHERS' RETIREMENT SYSTEM et al., Appellants.

First Department, November 8, 2001

## APPEARANCES OF COUNSEL

*Charles G. Moerdler* of counsel, New York City (*Alan M. Klinger, Faith A. Kaminsky* and *Joseph E. Strauss* on the brief; *Stroock & Stroock & Lavan, L. L. P.,* and *Carol L. Gerstl,* attorneys), for respondents.

*Alan Beckoff* of counsel, New York City (*Stephen J. McGrath, Anshel David, Susan Sanders* and *Jay Douglas Dean* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for appellants.

## OPINION OF THE COURT

Tom, J.

The issue in this appeal concerns whether certain hourly wages earned in addition to regular annual salary should be included in the computation of city teachers' retirement benefits. More specifically, plaintiffs are challenging defendant New York City Teachers' Retirement System's (TRS) exclusion, from the determination of retirement benefits, of "per session" activities. These activities include summer and evening school, athletic and nonathletic extracurricular activities, and adult education. Per session activities are defined in Regulation C-175 of the New York City School Chancellor as "any activity in which pedagogical employees are paid at an hourly rate." The scope of what constitutes per session activities is set forth in the collective bargaining agreement between defendant New York City Board of Education (BOE) and the plaintiff teachers' unions.

It should be noted that there is no appreciable difference from a pedagogical perspective between many per session activities and many regular school activities, especially since schools are legally required to ensure the availability of many per session programs, such as summer school, and students receive the same credit whether they attend summer or evening classes or regular day classes. These various activities form vital components of the education experience and, except for the hours when the activities are scheduled, they are not reasonably distinct from a school's usual activities. Rather, they are part and parcel of the educational experience for

students, and call on the very skills and talents for which teachers are hired. Notably, the BOE spent $95 million on per session activities in 1997, more than doubled that to $190 million in 1998, and $232 million in 1999.

The teachers' retirement benefits are governed by Administrative Code of the City of New York § 13-501 *et seq.* Initially, membership in the TRS is limited to "teachers" (§ 13-503), defined as "all employees of the board of education appointed to regular positions in the service of the public schools at annual salaries and whose appointments were made or shall be made from eligible lists prepared as a result of examinations held by the board of examiners or from hiring lists established by the chancellor of the board of education" (§ 13-501 [7] [a]).

As with other state and local employees, membership in the retirement system is allocated among tiers, depending in the main on the date of the teacher's entry. Four tiers are employed for the TRS. Each tier provides for different retirement benefits, with the higher level, and earlier established, tiers generally providing the most favorable benefits. These tiers anticipate and seek to prevent abuses by which prospective retirees otherwise might try to inflate their leaving salaries. Although each tier is different, all ensure that the pension is calculated on a spread of years rather than only the final year, and each eliminates various perks that otherwise might be used to enlarge pensionable compensation for those years upon which the pension will be calculated. Hence Tier I pensions, for members who joined TRS prior to July 1, 1973 (§ 13-501 [52]), are calculated by multiplying a percentage of their "average annual salary earnable" by years in service (§ 13-501 [18]; § 13-554). The average salary is calculated by averaging the salaries for the 5 years immediately preceding retirement or, in some circumstances, a 10 consecutive year period during employment (§ 13-501 [18]). In either event, by aggregating the final salary as an average over several years, the potential for abuse by inflating earnings during the period just preceding retirement is minimized. The point is driven home by the additional directive in section 431 of the Retirement and Social Security Law, applicable to state and local contributory pensions plans, that eliminates from the baseline retirement salary lump sum payments for deferred compensation, sick leave, accumulated vacation or other credits for time not worked, any form of termination pay, any additional compensation paid in anticipation of retirement, or any portion of compensation earned during any year which exceeds that of the preceding

year by more than 20%. However, the term "salary" is not therein defined, except by what it is not.

Tier II consists of members who joined City TRS on or after July 1, 1973, but before July 1, 1976. This tier also employs the term "average salary earned" for the final salary, averages the salaries for any three consecutive years of employment that provide the retiree with the highest average salary, and also excludes termination pay, lump sum deferred compensation, accumulated sick or vacation leave credit or other payments for time not worked, and, to the extent that any one of the three years in the pension baseline exceeds the other two years, caps the excess at 20% (Retirement and Social Security Law § 443 [a]). Interestingly, here the reference is to "salary" or "wages," implicitly including "wages" in the calculation of each such year's compensation for pension purposes.

Members who joined TRS after July 1, 1976 entered Tier III (Administrative Code of City of NY § 13-501 [54]; Retirement and Social Security Law § 500 [a]; § 504 [a]; § 512 [a]) or Tier IV (Administrative Code of City of NY § 13-501 [55]; Retirement and Social Security Law § 600 [a]; § 604 [a]; § 608). Despite some differences, Tiers III and IV also use a three year baseline, as had Tier II, but then employ different formulas to the resulting average salary. In this case, somewhat different from the higher tiers, the "final average salary" is also defined, not in terms of the salary "earnable" or "earned," but in terms of "wages." This difference, which defendants see as a significant distinction, is relied on by defendants in their argument. Tier III uses a 10% cap as contrasted with the 20% cap employed in the upper tiers. Both tiers require that "regular compensation" be the basis for calculation of "wages" (Retirement and Social Security Law § 501 [24]; § 601 [l]). Although the present proceeding involves City teachers and the City employer, Tiers III and IV members of the New York State Teachers' Retirement System also are governed by the Retirement and Social Security Law (§§ 500, 600). For those teachers, compensation for per session activities is pensionable as "regular compensation." Yet, New York City does not so provide, which forms the gravamen of plaintiffs' case.

Plaintiffs sought a declaration that by not including per session compensation as "regular compensation" in calculating the pensionable "final average" salary, TRS violated Administrative Code of the City of New York § 13-554 and Retirement and Social Security Law § 443 (a) and §§ 504 and 604. The parties then moved and cross-moved, respectively, for summary

judgment. This appeal is from the order of the IAS court (Gammerman, J.) granting plaintiffs summary judgment. We affirm.

Initially, since this litigation requires resolution of the meaning of statutory terms and does not implicate the knowledge and understanding of any underlying operational practices of the retirement system, we need not defer to defendants BOE or TRS in their interpretations of the terms (*Matter of Guido v New York State Teachers' Retirement Sys.*, 94 NY2d 64, 68).

The main thrust of defendants' argument is that Tier I excludes making per session work pensionable, that lower tiers are intended to provide lesser retirement benefits, ergo Tiers II through IV cannot be construed to allow including per session wages as a component of the salaries by which pensions are to be calculated. However, the premise, relating to Tier I, is wrong, so that the entire argument, as thus stated, fails. Moreover, even applying the statutory terms employed for those tiers does not lead to defendants' conclusion.

Defendants, starting with their analysis of Tier I benefits, string together elements of several definitions that really are employed for different purposes to make an argument that is semantic at best, and, in the main, an insupportable leap of logic. Defendants note that Tier I requires that final salary be calculated on the basis of the "annual salary *earnable*" over the course of 5 (or in some cases 10) years. Defendants argue that this must be understood in terms of a fixed salary that is ascertainable on a year-by-year basis which, as thus interpreted, excludes wage increments that are not so ascertainable. To carry this line of reasoning further, defendants argue that per session wages, which arise serendipitously, would not then be ascertainable, are not fixed, and cannot be understood, prospectively, as "earnable." By contrast, the term "earned" employed in Tier II allows for aggregating wages already "earned" with the base salary. As such, in defendants' argument, "earnable" must be seen as a distinctly different term, from which per session wages, not ascertainable in advance, are excluded. This chain of inferences, though, is unsupportable. First, there is nothing in the term "earnable" that compels such a meaning. Why would summer wages not be "earnable" within any given year? Moreover, as noted above, per session activities must be authorized in advance, though how much in advance is not clear from the record, but that fact undermines the rigidly prospective meaning that defendants impart to the term "earnable." Furthermore, to the extent that the relevant provisions of the Administrative Code and the

Retirement and Social Security Law interlock, certain payments are expressly excluded from pension calculations. By contrast, per session wages are not expressly excluded. Generally, the failure of a legislative body to include a matter within the scope of an act may be construed as an indication that its exclusion is intentional (*Pajak v Pajak*, 56 NY2d 394, 397). As noted by the IAS court, where a statute expressly excludes certain forms of compensation from pensions, other forms of compensation not so excluded must be included (*City of New York v New York Tel. Co.*, 108 AD2d 372, *appeal dismissed* 65 NY2d 1052). Hence, contrary to defendants' position, we conclude that these definitions were not intended to, and, on their face, do not, exclude per session wages from a Tier I teacher's pensionable salary base. By similar reasoning, nor were these wages intended to be excluded from the pensionable salary base for the remaining tiers as the relevant terms are employed as to those tiers.

We also reject defendants' argument that "annual salary" must correlate with "regular positions * * * at annual salaries," by which "teachers" are defined (*see*, Administrative Code of City of NY § 13-501 [7] [a]) and that in this sense, then, hourly wages—for per session work—are not a component of that teacher's "regular" work and hence not part of "annual salary" on which the "average salary" is calculated. There is nothing in these definitions, either, that precludes augmenting the fixed salary with additional wages to aggregate an average salary, earnable or earned, for each relevant year. As the IAS court noted, "regular" suggests an ongoing pattern or process as contrasted with ad hoc, or one-time, enterprises. Hence, payment for a one-time special project during the end of a career that significantly exceeded the actual salary was not "regular" and hence not pensionable (*Matter of Mowry v New York State Employees' Retirement Sys.*, 54 AD2d 1062). An "extra work incentive bonus," available to teachers only as they approached retirement age, was properly construed to be only a retirement incentive, not "regular" and hence not pensionable (*Matter of Miller v New York State Teachers' Retirement Sys.*, 157 AD2d 890). By contrast, per session work is targeted toward actual work generated by specific school programs, many of which are required by law, which must be planned in advance, and budgeted for, and may be "regularly" performed by qualifying teachers regardless of when it is to be performed in relation to retirement.

Nor are the Retirement and Social Security Law statutory policy concerns, restricting the extent to which an annual sal-

ary may be increased by other items for pension purposes, pertinent under these circumstances. The Legislature clearly wanted to preclude public employees, in this case teachers, from augmenting their last years' salaries by numerous financial recompense devices by which they could thus manipulate their pension benefits out of relationship with the work actually performed over the course of employment. In anticipation of the potential for the very abuses alluded to above, Regulation C-175 effectively restricts who may apply and be hired for per session work. The regulation governs the procedures by which openings for per session positions must be advertised. Teachers must directly apply for each per session activity that they seek to perform, may participate in only one activity per teacher during any time period, and are restricted in the number of hours performed. Repetitive per session assignments are restricted to merit appointments, in that retention rights may be claimed only by a teacher with two years of continuous satisfactory evaluations in that particular position. Priority in hiring is accorded to teachers with such retention rights and qualified day school teachers. Pointedly, the regulation is "aimed at avoiding possible abuses in per session employment" which "may not be used as a means of providing additional compensation for work in an individual's primary assignment." Its availability is not easily manipulated so that a teacher cannot, by this means, sharply escalate earnings during the last year or years (*Abbatiello v Regan*, 205 AD2d 1027, *lv denied* 84 NY2d 808). Nor are per session programs an apparent scheme allowing for the accumulation of additional compensation just prior to retirement (*id.*; *Matter of Bascom v McCall*, 221 AD2d 879) or an aggregation of compensation that should have been taken over the course of employment rather than all in the last year (*Matter of Moraghan v New York State Teachers' Retirement Sys.*, 237 AD2d 703). Rather, the regulation ensures to the contrary. To whatever extent per session wages may increase the final salary, the effect is likely to be marginal on an individual basis.

Finally, we reject the City's position that plaintiffs' claims are waived, or should be equitably estopped, or barred by the equitable doctrine of laches. Although the City faults plaintiffs for failing to negotiate these matters, it appears that, to the contrary, the City consistently treated these issues as not bargainable and subject exclusively to legislative enactments. Moreover, the issue really seems to have acquired momentum only with the dramatic expansion of per session activities in

recent years, so that plaintiffs should not be deemed to have reasonably delayed seeking relief.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Ira Gammerman, J.), entered October 24, 2000, which granted plaintiffs' motion for summary judgment to declare that defendants' failure to include "per session" compensation in the computation of retirement benefits violated various statutes, and denied defendants' cross motion for summary judgment to dismiss the complaint, should be affirmed, without costs.

NARDELLI, J. P., MAZZARELLI and SAXE, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered October 24, 2000, affirmed, without costs.